**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

POLYVISION CORPORATION,

      Plaintiff,

v.                                                      Case No. 22-CV-150-RAW

FIVES ST CORPORATION,

      Defendant.

**MEMORANDUM AND ORDER**

Before the Court is the motion of Defendant Fives ST Corporation ("Fives") for

partial summary judgment. *See* ECF No. 64 (Mot. for Partial Summ. J., filed Oct. 16,

2023). Plaintiff PolyVision Corporation ("PolyVision") filed a response, *see* ECF No. 83

(Resp. Br., filed Nov. 13, 2023), and Fives filed a reply, *see* ECF No. 88 (Reply Br., filed

Dec. 12, 2023). Specifically, Fives moves for partial summary judgment on three issues,

including whether:

> (1) the May 12, 2020 Amendment to the parties' equipment purchase
> agreement releases all . . . PolyVision['s] . . . claims against Fives except for
> claims, if any, for breach of the Amendment's express obligations arising
> after May 12, 2020;
>
> (2) the parties' equipment purchase agreement contains express limitations
> on remedies for breach that are enforceable and limit PolyVision's potential
> remedies to those expressly set forth in the agreement; and
>
> (3) even if gross negligence has any bearing on PolyVision's breach of
> contract claim, which it does not, PolyVision cannot show gross negligence
> as a matter of law.

ECF No. 64 at 1.

For the following reasons, the Court **denies** the Motion.

## I

PolyVision is a New York corporation that manufactures whiteboards made from ceramic coated steel at its plant in Okmulgee, Oklahoma. *See* ECF No. 64-1 at 1, ¶ 3 (Ex. 1 to Mot. for Partial Summ. J., Decl. of Daniel Balcer, dated Oct. 16, 2023).[1]  Fives is a Delaware corporation that designs, manufactures, and sells process equipment for large industrial groups. *See id.* at 1, ¶ 4.

On December 21, 2018, PolyVision and Fives entered into an Equipment Purchasing Agreement (the "Agreement"). *See* ECF No. 85-1 at 1 (Ex. 1 to Mot. for Partial Summ. J., Equip. Purchasing Agreement, dated Dec. 21, 2018) (sealed).[2]  In the Agreement, PolyVision agreed to purchase equipment from Fives to use in its manufacturing line. *See id.*  The equipment was to conform to specifications listed in an Equipment Schedule (the "Schedule"). *See id.*; *see also* ECF No. 85-2 at 1–63 (Ex. 2 to Mot. for Partial Summ. J., Equip. Schedule #1, dated Dec. 21, 2018) (sealed).

On May 12, 2020, the parties entered into an Amendment to the Agreement and the Equipment Schedule (the "Amendment"). *See* ECF No. 64-4 at 1–4 (Ex. 4 to Mot. for Partial Summ. J., Amend. to Equip. Purchasing Agreement & Equip. Schedule #1, dated May 12, 2020).  As relevant here, the Amendment provided:

> WHEREAS, Fives and PolyVision have entered into the Agreement and the Parties have disputes regarding the respective obligations of each Party under the Agreement.

---

[1]  Where the Court references a page number from one of the exhibits to the Motion for Partial Summary Judgment or Response, the Court uses the page number from the ECF header.

WHEREAS, performance by the Parties has been hindered by the COVID-19 pandemic, including the inability of certain Fives personnel to travel to the site.

WHER[E]AS, the Parties wish to settle the dispute and to document their agreement with certain modifications to the Agreement as provided in this Amendment.

NOW THEREFORE, intending to be legally bound, the Parties hereby agree to the following changes and amendments to the Agreement.

1.    <u>Modification to Obligations of Fives for Liquidated Damages.</u> In full satisfaction for all liquidated damages claims of PolyVision under Agreement for late deliver[y] or performance by Fives, Fives agrees to pay PolyVision the total amount of €100.000 . . . payable in two equal installments.  The first installment will be paid in May 2020 when Fives modifies the existing invoice to be paid by PolyVision to reduce it by €50.000.  The second payment will be paid at the conclusion of all performance under the Agreement.  Fives will also provide twenty (20) man-days of US based onsite services at the site at no additional cost.

2.    <u>Other Claims for Late or Defective Performance.</u>  In full satisfaction for all other claims of PolyVision under Agreement for late or defective performance by Fives, including claims related to additional costs associated with late delivery of furnace duct insulation drawings, Fives will also provide thirty (30) man-days of services from remote locations in the European Union (EU) at no additional cost.

3.    <u>Commissioning of the Equipment at the Site.</u>  The Parties acknowledge that the plans for commissioning of the Equipment at the Site have become problematic because of travel restrictions imposed by several governmental authorities.    The Parties agree to use commercially reasonabl[e] efforts to undertaking their respective responsibilities related to the commissioning of the Equipment as follows.

(a)    <u>Remote Supervision Services.</u>  While Fives has no experience in commissioning equipment remotely, Fives will provide personnel using appropriate communication tools to communicate and interface with

---

<sup>2</sup>    Fives filed an unopposed Motion to Seal four exhibits attached to its Motion for Partial Summary Judgment.  *See* ECF. No. 62 (Mot. to Seal, filed Oct. 13, 2023).  The Court granted that Motion.  *See* ECF No. 63 (Min. Order, filed Oct. 16, 2023).

PolyVision personnel at the site and . . . directly [with] local resources assisting in the commissioning.  PolyVision acknowledges and agrees that Fives is not making any warrant or representation that the commissioning services can be accomplished remotely in this manner, but Fives will use commercially reasonable efforts to perform the services in a good and workmanlike manner.

(b)     Remaining Commissioning Time and Rates.   Fives will provide resources for the remaining commissioning services required both on site with US based resources and remotely with EU based resources. . . .

. . .

5.     Mutual Release and Settlement of Claims: No Admission of Liability.  By execution of this Amendment, Fives and PolyVision agree to settle any and all disputes which exist or may exist regarding the Agreement through the date of this Amendment.  Except for the obligations of the Parties under this Amendment, each of the Parties does hereby release and forever discharge the other Party, and its representatives, assigns, successors, employees, agents, directors, indemnitors, insurers, and affiliated or associated entities from and against all claims, causes of action, losses, costs and expenses, obligations, liabilities (including any obligations related to third party claims), injuries, damages or demands arising out of or related to the Agreement, whether known or unknown, asserted or not asserted, whether arising in equity, under common law, state or federal statute, contract, or by any other authority, including, claims of negligence or any claim arising in tort, product liability, breach of contract, negligent misrepresentation, breach of warranty or any other claims that in any way, directly or indirectly, arise from or relate to the Agreement.  The Parties intend that this mutual release and settlement shall fully, finally, and completely settle and resolve all claims and disputes asserted or that could be asserted by either of the Parties against the other through the date of this Amendment, including claims for liquidated damages, site reworks, extra works, third party claims and outstanding payments.  The Parties recognize and acknowledge that the promises made in this Amendment constitute[] adequate and valuable consideration for any damages that may be claimed under the Agreement.  Neither Party admits to any liability associated with the Agreement or to any claims that could have been asserted by a Party against the other Party.  Each Party reserves its rights and defenses related to claims of force majeure under the Agreement, including as a result of or related to COVID-19, to the extent that the claims or defenses are not specifically resolved in this Amendment.

4

    6.    <u>Confidentiality.</u>   This Amendment shall be confidential between the Parties.

    7.    <u>Survival of Agreement.</u>   Except as amended in this Amendment, all other terms and conditions of the Agreement shall remain in full force and effect.

ECF No. 64-4 at 1–4.

On June 10, 2022, PolyVision filed the operative Amended Complaint, bringing one count against Fives for breach of contract. *See* ECF No. 19 at 9 (Am. Compl., filed June 10, 2022). PolyVision alleges that the equipment Fives sold it pursuant to the Agreement "does not work as it should." *Id.* at 1. In particular, PolyVision alleges that Fives breached its "obligations in mis-designing the equipment, failing to own up to its design failure, and continuously stringing PolyVision along with missed deadlines, false promises, and partial fixes." *Id.* Further, PolyVision alleges that this breach rose to the level of gross negligence and therefore PolyVision is entitled to substantial damages. *See id.*

On June 24, 2022, Fives moved to dismiss PolyVision's tort claim for gross negligence to the extent that it asserted one. *See* ECF No. 22 at 1–8 (Mot. to Dismiss, filed June 24, 2022). After PolyVision responded that it only intended to assert a breach of contract claim, *see* ECF No. 24 at 1 (Resp. to Mot to Dismiss, filed July 7, 2022), the Court denied the Motion to Dismiss as moot, *see* ECF No. 26 at 1 (Order Den. Mot. to Dismiss, filed Aug. 11, 2022). Fives filed its Answer to the Amended Complaint, and brought four counterclaims for breach of the Agreement, Schedule, and Amendment; and for declaratory judgment. *See* ECF No. 31 at 1–14 (Answer & Countercls., filed Sept. 1,

2022).  PolyVision answered the counterclaims.  *See* ECF No. 34 at 1–8 (Answer to

Countercls., filed Sept. 12, 2022).

On October 16, 2023, Fives filed the instant motion.  *See* ECF No. 64.  PolyVision

responded on November 13, 2023, *see* ECF No. 83, and Fives replied on December 12,

2023, *see* ECF No. 88.  On December 22, 2023, PolyVision filed a Motion for Leave to

File a Sur-Reply, *see* ECF No. 92 (Mot. to File Sur-Reply, filed Dec. 22, 2023), which

the Court denied on December 26, 2023, *see* ECF No. 94 (Min. Order, Dec. 26, 2023).

On February 23, 2024, Fives' Motion was referred to the undersigned.  *See* ECF No. 105

(Min. Order, filed Feb. 23, 2024).

## II

Summary judgment is appropriate if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a).  "A dispute is genuine if there is sufficient evidence on each side so

that a rational trier of fact could resolve the issue either way, and it is material if under

the substantive law it is essential to the proper disposition of the claim."  *Harvest Grp.,*

*LLC v. Love's Travel Stops & Country Stores, Inc.*, 90 F.4th 1271, 1280 (10th Cir. 2024)

(quoting *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1249 (10th Cir.

2020)).  The Court "construe[s] the factual record and the reasonable inferences

therefrom in the light most favorable to the nonmoving party."  *Id.* (quoting *Alfaro-*

*Huitron*, 982 F.3d at 1249).

"As this is a diversity matter, [the Court] 'must apply the substantive law of the

forum state, including its choice of law provisions.'"  *Id.* (quoting *Devery Implement Co.*

6

*v. J.I. Case Co.*, 944 F.2d 724, 727 (10th Cir. 1991)).  The Agreement provides that it "will be governed by and interpreted in accordance with the laws of the State of New York," ECF No. 85-1 at 7, and Oklahoma law honors such choice of law provisions, *see Berry & Berry Acquisitions, LLC v. BFN Props. LLC*, 416 P.3d 1061, 1068 (Okla. 2018); *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1236 (10th Cir. 2007).

### III

The Court will deny Fives' first request for summary judgment ("Issue I")—*viz.*, the argument that the Amendment releases all of PolyVision's claims against Fives except those for breach of the Amendment's express obligations arising after May 12, 2020—*because* (1) the Amendment did not absolve Fives from its continuing obligations under the Agreement after May 12, 2020, and (2) there is a genuine dispute of material fact as to whether Fives breached the Agreement and/or Amendment, which could preclude Fives from enforcing the terms of the release if true.

The Court will deny Fives' second request for summary judgment ("Issue II")— *viz.*, its argument for enforcement of the remedy and damages limitations provisions of the contracts—*because* Fives has not met its burden of showing which of PolyVision's claims those provisions purportedly limit.  And the Court will deny Fives' third request for summary judgment ("Issue III")—*viz.*, its argument that PolyVision cannot show gross negligence as a matter of law—*because* PolyVision has presented sufficient evidence to create a genuine dispute of material fact as to whether Fives was grossly negligent as a matter of law.

## A

Fives first moves for partial summary judgment on the basis that the release contained in the Amendment signed on May 12, 2020, "unequivocally precludes all of PolyVision's breach of contract claims based on conduct occurring prior to May 12, 2020, and limits any breach of contract claim to Fives' obligations under the Amendment after May 12, 2020." ECF No. 64 at 11. PolyVision responds that: (1) the context and language of the release show that the parties intended to limit the release to only Fives' COVID-19 delays and not "every conceivable claim the parties had against each other," ECF No. 83 at 22; (2) "Fives is barred from enforcing the release because it did not fulfill its obligations under the . . . Amendment," *id.* at 20; and (3) "[t]he [r]elease d[id] not absolve Fives of its obligations under the Agreement," *id.* at 25. The Court will deny summary judgment on this issue.

## 1

The Court begins with PolyVision's third counterargument—that the Amendment did not absolve Fives from its continuing obligations under the Agreement after May 12, 2020. This is correct. Although Fives argues that, after May 12, 2020, its only continuing obligations to PolyVision were its new obligations under the Amendment, the clear and unambiguous terms of the Amendment demonstrate that the Amendment only *added* or *modified* Fives' responsibilities under the Agreement and did not *supersede* Fives' continuing obligations under the Agreement.

This is evident by, *inter alia*, the "whereas" clause that indicates the Amendment makes "certain *modifications* to the Agreement," ECF No. 64-4 at 1; the fact that the

8

second liquidated damages installment was due "at the conclusion of all performance under the *Agreement*," *id.* at 1 (emphasis added); and—most tellingly—the survival clause of the Amendment, which provides the following: "[e]xcept as amended in this Amendment, all other terms and conditions of the Agreement shall remain in full force and effect," *id.* at 4.

Fives advances a misguided view of some of the language in Section 5 of the Amendment—the mutual release clause—in arguing that "[a]fter the Amendment was signed[,] . . . PolyVision's claim for breach of contract (and any alleged damages) cannot, as a matter of law, be based upon anything '[e]xcept for the obligations of the Parties under this Amendment.'" ECF No. 64 at 15 (third alteration in original) (quoting ECF No. 85-1 at 3). But this language in the release—to which Fives alludes—does not address whether Fives *retained* continuing obligations *under the Agreement* after May 12, 2020. In light of the unambiguous language in the Amendment, Fives was still contractually bound to comply with the terms of the Agreement (except as modified in the Amendment) after May 12, 2020.

## 2

The immediately foregoing discussion in subsection 1 provides a framework for the Court's resolution of Fives' summary judgment Issue I. The Court resolves that issue on the basis of PolyVision's second counterargument—that there is a genuine dispute of material fact as to whether Fives breached the Agreement *and/or* Amendment, which is material because—if it did—Fives would not be entitled to enforce the release under New York law.

9

Under New York law, "[a] release is a contract." *Schiller v. Guthrie*, 958 N.Y.S.2d 736, 737 (N.Y. App. Div. 2013) (quoting *Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*, 902 N.Y.S.2d 123, 126 (N.Y. App. Div. 2010)). And "[r]elease provisions are governed by the same principles that govern contracts." *Ferguson v. Ferrante*, No. 13–CV–4468, 2015 WL 3404131, at *5–6 (S.D.N.Y. May 27, 2015) (unpublished) (citing *Wells v. Shearson Lehman/Am. Express, Inc.*, 526 N.E.2d 8, 12 (N.Y. 1988)). Additionally, under well-settled New York contract law, "one who breaches a contract may not seek to enforce other provisions of that contract to his or her benefit." *Onex Foods Servs., Inc. v. Grieser*, Nos. 93-CV-0278 & 94-CV-3063, 1996 WL 103975, at *5 (S.D.N.Y. Mar. 11, 1996) (unpublished); *see also Felix Contracting Corp. v. Oakridge Land & Prop. Corp.*, 483 N.Y.S.2d 28, 29 (N.Y. App. Div. 1984); Glen Banks, 28 N.Y. PRAC., CONTRACT LAW § 17:13 (July 2024 update) ("A party who materially breaches a contract may not seek to enforce other provisions of that contract.").

PolyVision relies on *Kapitus Servicing, Inc. v. MS Health, Inc*., 189 N.Y.S.3d 172 (N.Y. App. Div. 2023), a recent New York Supreme Court Appellate Division case that specifically applies this rule to the context of a party seeking to enforce a release in a settlement agreement where that party had otherwise already breached the settlement agreement. *See* ECF No. 83 at 20 (citing 189 N.Y.S.3d at 174). Fives recites the facts of that case and asserts that "*Kapitus* is distinguishable and has no application to the undisputed facts here." ECF No. 88 at 8. But Fives does not adequately explain how it is distinguishable *as a matter of law*. And, here, PolyVision has "show[n] more than '[t]he mere existence of a scintilla of evidence in support of [its] position'" that Fives breached

10

the Agreement and/or Amendment after May 12, 2020—which could preclude Fives from enforcing the release if true. *N.M. Oncology & Hematology Consultants*, 994 F.3d 1166, 1171–72 (10th Cir. 2021) (second alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

PolyVision alleges two main breaches of *the Amendment*: that Fives (1) never paid the second installment of the liquidated damages clause, and (2) "breached its obligations under the Amendment because it failed to complete the project within a reasonable time." ECF No. 83 at 21 n.3. Significantly, however, PolyVision also alleges a host of deficiencies—with supporting record evidence—in its "Statement of Facts Precluding Summary Judgment," related to Fives' *continuing obligations under the Agreement*—as well as new obligations under the Amendment. *See id.* at 8–16, ¶¶ 17–71; *see also* ECF No. 85-4, at 3–4 (Ex. 4 to Partial for Summ. J., Letter from Steve Newell to Thomas Lease, dated Jan. 24, 2022) (sealed) (detailing Fives' "major deficiencies throughout the project").

For example, PolyVision asserts that "[t]he Fives team responsible for overseeing installation and commissioning was under-resourced and incompetent." ECF No. 83. at 9. In support, PolyVision produces an email sent on September 20, 2021, from Fives' President Daniel Balcer to David Sequeira—Fives' Project Manager for the duration of the equipment installation period—which states: "David, We have a lot of work left on all of these issues and the one that concerns me the most is that no one on this project is an experienced commissioning supervisor." ECF No. 83-14, at 2 (Ex. 14 to Resp. to Partial for Summ. J., Email from Daniel Balcer to David Sequeira, dated Sept. 20, 2021).

11

PolyVision also produces a Risk and Support Assessment prepared by a third party on

March 15, 2021, which notes:

> David Sequeira – Fives Project Director, is very dismissive of PolyVision's
> questions or concerns and only communicates when he wants.  David will
> make changes and not share what he has done or why he did it.  The daily
> plan is not adhered to and when a change is made, the change (and reason for
> it) is not always communicated to the entire team.

ECF No. 85-3 at 10 (Ex. 3 to Partial for Summ. J., PolyVision Risk & Supp. Assessment,

dated Mar. 15, 2021) (sealed).  On November 12, 2021, Daniel Balcer also emailed

another Fives employee: "I am hearing from all sides that David is not communicating or

assuming the role as the project manager.  I will be on site on Tuesday[.]  I will not be

able to resolve the situation but at least I will have a better understanding.  In the mean

time I will check . . . to see if there are any viable options to replace David on site."  ECF

No. 83-17 at 2 (Ex. 17 to Resp. to Partial for Summ. J., Email from Daniel Balcer to

Guilaume Mehlman, dated Nov. 12, 2021).

PolyVision also writes in the Response that "Fives[] misrepresented the root cause

of the Line's steering failures and ignored its own consultants."  ECF No. 83 at 11.  In

particular, PolyVision asserts that there was a steering design issue with the equipment,

which Fives maintained was an alignment issue—and PolyVision relied on Fives'

representations to that effect—but Fives was well aware that the issue was actually due to

design flaws.  *See id.* at 11–12, ¶¶ 43-45, 51, 55.  PolyVision produces several pieces of

substantial evidence in support of this assertion.  To support that Fives knew it was a

design issue, PolyVision produces:

1) An email sent on October 19, 2021, from Pierre Champrenaut at Fives to Daniel Balcer that states that a steering specialist Fives agreed to dispatch advised that "it [was] more of a design issue and he d[id] [not] think he could do anything even [by] going [to the site]." ECF No. 83-26 at 2 (Ex. 26 to Resp. to Partial for Summ. J., Email from Pierre Champrenaut to Daniel Balcer, dated Oct. 19, 2021).

2) An email sent on November 22, 2021, from Fives engineering manager Thomas Lease to David Sequeira, which states: "I spoke with Max Werner at Precision Metal Controls.  He said our main problem is that steering unit 4 should be designed like unit number 2.  He said that steering 1 and 3 were not designed well either.  All four steering units should be like number 2 according to Max." ECF No. 83-28 at 2 (Ex. 28 to Resp. to Partial for Summ. J., Email from Thomas Lease to David Sequiera, dated Nov. 22, 2021).

3) An email sent on December 19, 2021, from Fives contractor Lionel Demeyer to Daniel Balcer, which states: "During our French speaking with Guillaume Melhman, he asked me if there is a design problem.  Now I have to say yes. Steering #1 is not correct . . . .  It's not adapted for the direction of the strip tension.  I am working on actual design with light modification to improve it, [to] [provide] a safe situation.  Machining of looper rail not done.  Wheel of mobile frame of the looper not guided.  Furnace seal not strong enough." ECF No. 83-29, at 2 (Ex. 29 to Resp. to Partial for Summ. J., Email from Lionel Demeyer to Daniel Balcer, dated Dec. 19, 2021).

PolyVision also produces evidence that Fives intentionally withheld information from PolyVision, including:

1) An email sent on October 22, 2020, from Thomas Lease to David Sequeira, which states: "Let's keep the conversation today with [PolyVision] focused on the alignment . . . .  We don't want to bring up the roll coverings because these will cost us money and delay.  Additionally, we don't want to bring up the cleaning strip because we could have and should have cleaned the strip from the start if this was necessary to correct strip tracking."  ECF No. 83-21 at 2 (Ex. 21 to Resp. to Partial for Summ. J., Email from Thomas Lease to David Sequeira, dated Oct. 22, 2020).

2) An email sent on December 14, 2021, from Thomas Lease to Daniel Balcer regarding the visit report from third party Max Werner at Precision Metals Controls, which states: "What do you think about sending Max's report to PolyVision?  He does point out flaws other than alignment."  ECF No. 83-23 at 2 (Ex. 23 to Resp. to Partial for Summ. J., Email from Thomas Lease to Daniel Balcer, dated Dec. 14, 2021).

3) An email sent on December 28, 2021, from Thomas Lease to OMNI Systems Group—which Fives contracted with to prepare a report on the roll alignment issue—asking an OMNI employee to remove certain text from its third-party report before Mr. Lease could "forward [it] to PolyVision," because Mr. Lease said the issue identified in the report could be resolved if the roll was

"correctly aligned." ECF No. 83-24 at 2 (Ex. 24 to Resp. to Partial for Summ. J., Email from Thomas Lease to Justin Dodds, dated Dec. 28, 2021).

Therefore, in the Court's view, there is a genuine dispute of material fact as to whether Fives breached its continuing obligations under the Agreement *and/or* its obligations under the Amendment—before *and after* the signing of the Amendment. Because a material breach[3] of the contract(s) could prevent Fives from enforcing the mutual release clause in the Amendment, *see, e.g.*, *Onex Foods*, 1996 WL 103975, at *5, Fives has not met its burden of showing that it is entitled to summary judgment on Issue I.[4]

---

[3]    The more recent New York cases specify that a party's breach must be *material* to disentitle them from other benefits under the contract. *See, e.g.*, *Conergics Corp. v. Dearborn Mid-W. Conveyor Co.*, 43 N.Y.S.3d 6, 18 (N.Y. App. Div. 2016). But PolyVision's allegations seemingly suffice to allege *material* breaches of the Agreement and/or Amendment. "[F]ailure to perform in a timely manner [c]ould constitute a material breach" "depend[ing] upon the facts and circumstances of the particular case." *Baisch, Inc. v. Pike Co., Inc.*, 959 N.Y.S.2d 786, 787 (N.Y. App. Div. 2013). Further, the defective equipment and failure to supervise allegations could very well be material if they "go to the root of the agreement between the parties." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). In that regard, considering that defective equipment would undermine the purpose of an agreement to purchase equipment, and that the Amendment was specifically intended to cure supervisory defects, breaches in these two areas would seemingly be material.

[4]    Because PolyVision has already shown there is a genuine dispute of material fact as to whether Fives breached the contract(s)—which could prevent Fives from enforcing the terms of the Amendment's mutual release clause if true—the Court need not reach the parties' dispute regarding the scope of the release—*viz.*, whether the release applies only to claims based on COVID-19 delays or, instead, to any and all claims under the Agreement.

**B**

Fives next moves for partial summary judgment to "enforc[e] the remedy and limitations of damages provisions of the Agreement and Equipment Schedule." ECF No. 64 at 15. Fives avers that "PolyVision is seeking to recover damages that are precluded by the . . . Agreement and Equipment Schedule." *Id.* In particular, Fives states that "PolyVision . . . is . . . seeking damages for such items as Incremental Cost Impacts and lost profits." *Id.* PolyVision responds that Fives "has failed to meet its burden of proving that any specific category of damages PolyVision claims is excluded by the Agreement" because Fives "never actually identifies the specific categories of PolyVision's damages it contends are barred by the Agreement, much less [offers] an explanation for *why* that category is barred by the Agreement." ECF No. 83 at 22. For example, PolyVision argues "[w]ith respect to Incremental Cost Impacts, it is not at all clear what language in the exculpatory provision Fives is relying on to claim that these damages are excluded." *Id.* at 23–24.[5] The Court agrees with PolyVision and will deny summary judgment on this issue.

Fives specifically cites to Agreement Sections 5.1.A, 5.1.C.ii–iii, 5.2, 5.3, 9.16, and 9.17; and Schedule Sections 4 and 5 for the proposition that these sections limit the remedies and damages available to PolyVision. *See* ECF No. 64 at 15–16. Fives further

---

[5] As to lost profits, PolyVision argues that "the 'loss of profits' language in the exculpatory provision is not a standalone limitation on the recovery of lost profits [but] [r]ather . . . modifies 'consequential damage,' such that only lost profits that are classified as consequential damages (as opposed to direct damages) are excluded." ECF No. 83 at 24.

characterizes these provisions as "sole remedy" provisions and invokes *Matter of Part 60 Put-Back Litigation*, 165 N.E.3d 180 (N.Y. 2020), to preemptively argue that PolyVision may not circumvent these provisions by alleging gross negligence. *Id.* at 16.

Sections 5.1.C.iii and 5.2 pertain to the Agreement's "Certifications, Remedies, and Warranties." ECF No. 85-1 at 3. Specifically, Section 5.1.C.iii contains an "exclusive remedy" to "repair or replace the Equipment" if Fives breaches its express warranty that "the Equipment will be manufactured, packaged, labeled when delivered in accordance, and comply in all other respects, with mandatory applicable laws, regulations, ordinances and standards." *Id.* at 4. Section 5.2 provides that Fives "warrant[s] that at the time of the test described in Section 4 of the Equipment Schedule, the Equipment will meet the performance guarantees described in Section 4 [but] [i]f the Equipment fails to meet these performance guarantees, [PolyVision's] sole and exclusive remedies will be as described in Section 4 of the Equipment Schedule." *Id.*

Section 4 of the Schedule contains certain performance guarantees for tests to be run and provides that "[l]iquidated damages shall be the sole and only remedy in the event of non-performance of these guarantees, limited to an aggregate amount of 3% of the total equipment price." ECF No. 85-2 at 56. It also provides for liquidated damages for late delivery of equipment. *Id.* at 59.

Section 9.16 of the Agreement is a standalone overarching limitation of remedies provision, and Section 9.17 provides that "the overall and aggregate liability of each

party to the other . . . shall not exceed the total amount payable by [PolyVision] to [Fives] under this Agreement." ECF No. 85-1 at 8.[6]

However, for Fives, the problem is that it does not tie any of these purportedly limiting contract provisions to PolyVision's specific claims. For example, Section 4 of the Schedule provides that liquidated damages shall be the sole remedy for non-performance of testing guarantees, not to exceed three percent of the total equipment price. *See* ECF No. 85-2 at 56. But Fives does not identify in the Motion whether PolyVision is even alleging a breach of testing guarantees under that section, much less what specific damages PolyVision is seeking for that breach (in type *or* amount). Without Fives tying the remedies that it seeks to exclude (e.g., incremental cost impacts and lost profits) to specific breaches that PolyVision alleges under particular provisions of the contract(s), the Court cannot determine whether Fives is entitled to judgment as a matter of law that PolyVision's remedies are indeed limited. Moreover, it logically follows that the Court need not opine at this juncture on whether the provisions Fives cites are "sole remedy" provisions, and/or the relevance of *Matter of Part 60 Put-Back Litigation*, 165 N.E.3d 180 (N.Y. 2020). *See* ECF No. 64 at 16–18; ECF No. 83 at 25–27; ECF No. 88 at 16–17.

Fives attempts to cure this briefing defect in its Reply by doing exactly what it failed to do in its Motion—that is, by pointing to specific allegations made by PolyVision

---

[6]    Agreement Sections 5.1.A, 5.1.C.ii, and 5.3, and Schedule Section 5 are warranty clauses. The Court identifies no obvious damages limitation clauses in those sections. And Fives has not met its burden of showing *why* it is entitled to summary judgment in relation to those sections.

in the record, and then pointing to the section(s) of the contract(s) that purportedly limit remedies for that allegation. *See* ECF No. 88 at 10–12. But this late blooming action is insufficient to cure Fives' initial briefing defect.

When a moving party raises new material in its reply brief at the summary judgment stage, a court may either afford "the [non-moving] party leave to file a surreply" or decline to "rel[y] on new materials or new arguments in the [moving] party's reply brief." *Conroy v. Vilsack*, 707 F.3d 1163, 1180 n.6 (10th Cir. 2013); *see also Martinez v. Tyson Foods, Inc.*, No. CIV-12-148-RAW, 2013 WL 5835705, at *2 n.3 (E.D. Okla. Oct. 30, 2013) (unpublished) ("The court sometimes is skeptical of 'new evidence' put forward in a reply brief by a movant in the summary judgment context. The non-moving party seemingly has no mechanism for rebuttal . . . ."). That choice is "a 'supervision of litigation' question" left to the discretion of the district court. *Conroy*, 707 F.3d at 1180 n.6; *see also Allianz Life Ins. Co. of N. Am. v. Muse*, No. 20-6026, 2022 WL 3701606, at *9 (10th Cir. 2022) (unpublished).

Here, Fives' raising of these new arguments and evidence in relation to Issue II in its Reply was the central subject of PolyVision's Motion for Leave to File a Sur-Reply. *See* ECF No. 92 at 2, ¶ 7. PolyVision averred that "Fives's arguments concerning how the exculpatory provisions apply to certain categories of PolyVision's damages are entirely new." *Id.* Therefore, PolyVision requested that the Court either not consider these new arguments or, in the alternative, grant PolyVision the opportunity to file a sur-reply. *See id.* at 3. Because the Court has denied PolyVision's Motion for Leave to File a Sur-Reply, *see* ECF No. 94, the Court declines to rely on these new arguments now. *See Otten v.*

*BNSF Ry. Co.*, No. 22-8025, 2023 WL 1948626, at *4 (10th Cir. 2023) (unpublished) ("A district court relying on new evidentiary materials or new arguments presented in a reply brief without permitting the nonmoving party an opportunity to respond amounts to an abuse of discretion." (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003)). And Fives' Reply illustrates precisely why Fives' briefing on this issue in its Motion did not meet Fives' burden of persuasion. Therefore, the Court will deny summary judgment on Issue II.

## C

Fives lastly requests a determination that PolyVision has not presented sufficient evidence of gross negligence as a matter of law. *See* ECF No. 64 at 18. Fives argues that PolyVision has simply alleged multiple instances of ordinary negligence, which is insufficient to show gross negligence. *See id.* at 21 (citing *Tougher Indus., Inc. v. Dormitory Auth. of State*, 15 N.Y.S.3d 262, 266 (N.Y. App. Div.2015)). PolyVision, in turn, asserts that Fives "misconstrues [its] theory of the case" because PolyVision indeed alleges instances of gross negligence, and there is sufficient evidence to create a genuine dispute of material fact as to whether Fives was grossly negligent. ECF No. 83 at 29. Specifically, "PolyVision contends that Fives was grossly negligent by (1) willfully ignoring the extensive failures of its employees in the design and commissioning of the Line over the course of two years[;] (2) ignoring the advice of experts retained to diagnose and resolve the problems with the Line; and (3) misrepresenting to PolyVision the reasons for the Line's failures." *Id.* at 29–30. The Court will deny summary

judgment on this issue because there is a genuine dispute of material fact as to whether Fives was grossly negligent.

In New York, "[a] party may not limit liability for damages caused by its own grossly negligent conduct." N.Y. PRAC., CONTRACT LAW, *supra*, § 24:16; *see also Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 683 (N.Y. 2012) ("[E]xculpatory clauses and liquidated damages clauses in contracts are not enforceable against allegations of gross negligence."). But, for conduct to rise to the level of gross negligence, it must "evince[] a reckless disregard for the rights of others or smack[] of intentional wrongdoing." N.Y. PRAC., CONTRACT LAW, *supra*, § 24:16; *see also Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (N.Y. 1992).

Yet, "[a] plaintiff cannot overcome a contractual limitation on liability simply by adding a conclusory allegation of gross negligence to a cause of action." N.Y. PRAC., CONTRACT LAW, *supra*, § 24:16; *see also Am. Auto. Ins. Co. v. Rest Assured Alarm Sys., Inc.*, 786 F. Supp. 2d 798, 808 (S.D.N.Y. 2011). And "[g]ross negligence cannot be demonstrated by alleging the cumulative effect of multiple items of ordinary negligence." *Id.* (citing *Tougher Indus., Inc.*, 15 N.Y.S.3d at 266).

However, whether a party was grossly negligent is a question of fact usually reserved for the jury. *See Lubell v. Samson Moving & Storage, Inc.*, 763 N.Y.S.2d 30, 31 (N.Y. App. Div. 2003). Therefore, under New York law, the following framework applies:

1) "[I]f the plaintiff has presented evidence that defendant did not act with even slight care or slight diligence," "[t]he determination of whether the breaching

party was grossly negligent presents an issue of fact to be resolved at trial." N.Y. PRAC., CONTRACT LAW, *supra*, § 24:16; *see also Gentile v. Garden City Alarm Co., Inc.*, 541 N.Y.S.2d 505, 510 (N.Y. App. Div. 1989).

2) "If the plaintiff *has not* presented evidence that defendant acted with reckless indifference to plaintiff's rights, the exculpatory clause will be enforced and summary judgment granted against plaintiff despite its claim of gross negligence." N.Y. PRAC., CONTRACT LAW, *supra*, § 24:16 (emphasis added); *see also David Gutter Furs v. Jewelers Prot. Servs., Ltd.*, 79 N.Y.2d 1027, 1029 (N.Y. 1992).

3) And "when defendant presents evidence that the exculpatory clause applies, defendant did not act with gross negligence, and plaintiff does not present evidence to dispute these points," "[s]ummary judgment will be granted in defendant's favor." N.Y. PRAC., CONTRACT LAW, *supra*, § 24:16; *see also Chan v. Counterforce Cent. Alarm Servs. Corp.*, 930 N.Y.S.2d 680, 682 (N.Y. App. Div. 2011).

Here, Fives has not meaningfully engaged with the record to explain why the evidence shows only ordinary negligence rather than gross negligence. *See generally* ECF No. 64 at 18–21. This is not sufficient on summary judgment. *See Coit v. Zavaras*, 175 F. App'x 226, 229 (10th Cir. 2006) ("[T]he defendant[] must make more than a . . . conclusory assertion that [the plaintiff] does not have enough evidence to carry its burden at trial . . . .").

PolyVision, on the other hand, responds with citations to specific evidence in the record that a jury could find constitutes gross negligence. *See* ECF No. 83 at 28–29.  For example, PolyVision points to evidence that indicates Fives was aware there was a design issue with the equipment, ignored its own experts' opinions concerning the design issue, and intentionally misrepresented the cause of the issue to PolyVision—causing PolyVision to expend its own money in a misdirected fashion in trying to fix the issue, unaware that it stemmed from a design defect. *See, e.g.*, ECF No. 83-27 at 3 (Ex. 27 to Resp. to Partial for Summ. J., Email Pierre Champrenaut to Daniel Balcer, dated Oct. 19, 2021); ECF No. 83-28 at 2; ECF No. 83-21, at 2; ECF No. 83-23 at 2; ECF No. 83-25 at 2, 6 (Ex. 25 to Resp. to Partial for Summ. J., Email from Thomas Lease to Justin Dodds, dated Jan. 24, 2022).

In its Reply, Fives contends that its gross negligence argument "rests on PolyVision's original interrogatory answer explaining its theory of gross negligence and that answer was insufficient as a matter of law," but acknowledges that "PolyVision [has since] supplemented the answer before filing its Response." ECF No. 88 at 17–18. Nevertheless, Fives asserts the following: "The supplemental answer (consisting of conclusions and argument) and the additional facts alleged by PolyVision certainly show Fives and PolyVision fundamentally disagreed about the nature of the problems on the project, but they do not show 'a reckless indifference to the rights of others' that is necessary to 'pierce an agreed-upon limitation of liability in a commercial contract.'" *Id.* at 18 (quoting *Sommer*, 79 N.Y.2d at 554).  The Court disagrees.  The evidence PolyVision cites—mentioned above—could lead a jury to conclude that Fives did not act

with even "slight care" or "slight diligence" in commissioning the line for PolyVision. *Gentile*, 541 N.Y.S.2d at 510; *see also supra* Section III.A.2 (detailing more of this evidence).

The cases that Fives summarily cites are inapposite. *See* ECF No. 64 at 20 n.1. First, in *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10-CV-1615, 2011 WL 3273487, (S.D.N.Y. July 29, 2011) (unpublished), the court found that the defendant's conduct did not exhibit reckless disregard for the plaintiff's rights because the allegedly grossly negligent practice *benefited* the plaintiff. *See id.* at *8. Here, Fives does not aver that its alleged conduct benefitted PolyVision.

Next, in *Lubell v. Samson Moving & Storage, Inc.*, 763 N.Y.S.2d 30 (N.Y. App. Div. 2003), the court held that allegations that a moving company failed to maintain its storage facility and lost certain of the plaintiff's items did not rise to the level of gross negligence because those were allegations of ordinary negligence in the context of a moving company. *See id.* at 32. And in *David Gutter Furs v. Jewelers Protection Services, Ltd.*, 79 N.Y.2d 1027, 1029 (N.Y. 1992), the court held that allegations around a negligently designed and installed security system did not amount to reckless indifference to the plaintiff's rights. *See id.* at 1028. Similarly, in *Ninacci Diamond & Jewelry Co. v. R.A.V. Investigative Services, Inc.*, No. 95-CV-9302, 1998 WL 299926 (S.D.N.Y. June 9, 1998) (unpublished), the court relied on factually analogous cases where a prior court had held that similar allegations did not rise to reckless indifference. *See id.* at *6. Yet Fives points to no law from cases that are factually analogous to *this one*, that indicate what would amount to gross negligence in the context of equipment

24

commissioning.  By failing to explain where the line is between ordinary negligence and gross negligence in *this* context, Fives has not shown as a matter of law that PolyVision's allegations fail to *cross* that line.[7]

Therefore, there is a genuine dispute of material fact as to whether Fives was grossly negligent, and Fives has not met its burden of proving that it is entitled to summary judgment on Issue III.

## IV

For the foregoing reasons, the Court will deny Fives' Motion for Partial Summary Judgment in full.

---

[7]    In *Alleyne v. Four Seasons Hotel—New York*, No. 99-CV-3432, 2001 WL 135770, (S.D.N.Y. Feb. 15, 2001) (unpublished), "the plaintiff [did] not provide[] evidence of unconscionability to avoid operation of the provision limiting the defendant's liability for breach of contract." *Id* at *18*.  But, again—as indicated above—PolyVision *has* provided evidence of gross negligence.  Furthermore, PolyVision points out, *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002), does not meaningfully analyze gross negligence, and to the extent it implies "gross negligence is not a basis for invalidating a limitation of liability provision, it is plainly at odds with binding, New York state court precedent."  ECF No. 83 at 30 n.6.  Lastly, *World-Link, Inc. v. Citizens Telecomm. Co.*, No. 99-CV-3054, 2000 WL 1877065 (S.D.N.Y. Dec. 26, 2000) (unpublished), involved a challenge to the meaning of the text of certain contract provisions, and did not relate to factual allegations of gross negligence like those present here.  *See id.* at *5.

**IT IS THEREFORE ORDERED** that Defendant Fives' Motion for Partial Summary Judgment, ECF No. 64, is **DENIED**.

Dated this 15th day of August 2024.

*Jane A. Holmes*

_____

JEROME A. HOLMES
CHIEF JUDGE OF THE UNITED STATES COURT
OF APPEALS FOR THE TENTH CIRCUIT, sitting by
designation pursuant to 28 U.S.C. § 291(b).

26